UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

CASE NO.

TLI ABM INC., a Texas corporation d/b/a ELEVATE HEALTH TECHNOLOGIES,

*Plaintiff*,

v.

RAUL PENA, an individual; DOUG HIURA, an individual; HEALTHWAVE SPECIALTY PHARMACY SERVICES, a California business entity; and HEALTHBRIDGE FL LLC, a Florida limited liability company,

*Defendants*.
_______________________________________/

**COMPLAINT AND DEMAND FOR JURY TRIAL**

Plaintiff, TLI ABM INC., a Texas corporation doing business as ELEVATE HEALTH TECHNOLOGIES ("Elevate" or "Plaintiff"), by and through the undersigned counsel, hereby files this Complaint against Defendants RAUL PENA, DOUG HIURA, HEALTHWAVE SPECIALTY PHARMACY SERVICES, and HEALTHBRIDGE FL LLC (collectively, the "Defendants"), and states as follows:

## INTRODUCTION

1. This action arises from a coordinated and deliberate scheme by Defendants to misappropriate Elevate's trade secrets, divert its clients, and establish a competing enterprise using Elevate's proprietary information—all while Elevate employed and compensated the scheme's key participants. The scheme involved the systematic theft of proprietary pro forma methodologies, patient data, physician referral source information, confidential information, proprietary financial modeling tools, client leads, and operational workflows.

2. Defendants then used Elevate's stolen property to form and operate HealthBridge Solutions (the "ENTERPRISE"), a direct competitor to Elevate in the specialty pharmacy services industry.

3. The evidence of misappropriation is extensive and well-documented, including electronic communications, text messages, LLC formation documents, pharmacy dispensing logs, and the testimony of cooperating witnesses with firsthand knowledge of the entire conspiracy.

## JURISDICTION AND VENUE

4. This Court has federal question jurisdiction pursuant to 28 U.S.C. § 1331 because this action arises, in part, under the Defend Trade Secrets Act of 2016, 18 U.S.C. § 1836, et seq. ("DTSA").

5. This Court may exercise supplemental jurisdiction over all state-law claims stated herein under 28 U.S.C. § 1367, as the state-law claims arise from the same case or controversy as the federal claims.

6. Venue is proper pursuant to 28 U.S.C. §§ 89(b) and 1391(b) because a substantial part of the events or omissions giving rise to the claims occurred in the Middle District of Florida's Tampa Division, including the formation of HealthBridge FL LLC as a Florida limited liability company registered in this District, the solicitation of physician clients located in this District, and the transmission of Elevate's misappropriated trade secrets to and from individuals and entities located in this District.

7. This Court has personal jurisdiction over Defendant Raul Pena because he has purposefully directed his tortious conduct toward the State of Florida, including targeting Elevate's physician clients and referral sources in Florida with medically integrated dispensing ("MID") services, and admitting in a March 19, 2026 text message that the competing enterprise "will target his colleagues in PR and Florida."

8. This Court has personal jurisdiction over Defendant HealthWave Specialty Pharmacy Services because it has conducted business in Florida, including providing competing MID management services to Florida physician clients and operating through its Florida alter ego, HealthBridge FL LLC.

9. This Court has personal jurisdiction over Defendant HealthBridge FL LLC because it is a Florida limited liability company formed on February 12, 2026, with a registered address at 7901 4th Street N, St. Petersburg, Florida 33702.

10. This Court has personal jurisdiction over Defendant Doug HIURA because he purposefully directed his tortious conduct toward the State of Florida, including co-founding and structuring HealthBridge Solutions, LLC as a Florida-based company to serve as the ENTERPRISE's vehicle for the Defendants' misconduct; coordinating the formation of HealthBridge FL LLC in this District; and participating in the scheme to solicit Elevate's Florida physician clients and divert their business to HealthBridge FL LLC and HealthWave Specialty Pharmacy Services.

## THE PARTIES

11. Plaintiff TLI ABM Inc. ("TLI ABM") is a Texas corporation doing business as Elevate Health Technologies ("Elevate"), with its principal place of business in Houston, Texas. Elevate is a specialty pharmacy services company that provides medically integrated dispensing management, in-office infusion program management, and related consulting services to physician practices throughout the United States. While developing and operating these programs,

Elevate has created and maintains substantial proprietary and confidential information constituting trade secrets under federal and state law.

12. Defendant Raul Pena ("PENA") is an individual residing at 25211 Keats Lane, Stevenson Ranch, California 91381. Elevate formerly employed PENA as Senior Vice President of Sales. Elevate entrusted PENA with access to its most sensitive confidential and proprietary information, including patient data and census information, physician referral source identities and relationships, proprietary financial modeling tools and pro forma methodologies, credentialing and onboarding workflows, client contractual terms and fee structures, and standard operating procedures for MID and in-office infusion programs.

13. Defendant HealthWave Specialty Pharmacy Services ("HEALTHWAVE") is a California business entity with its principal place of business located at 3505 Cadillac Ave., O-104, Costa Mesa, California 92626. Thomas Nguyen (also known as Thomas Nguyenfa) ("Nguyen") owns and operates HEALTHWAVE. HEALTHWAVE is a specialty pharmacy that has taken over MID management services at a former Elevate client site and is providing the pharmacy operations arm of the competing enterprise organized by Defendants.

14. Defendant HealthBridge FL LLC ("HEALTHBRIDGE") is a Florida limited liability company formed on February 12, 2026, with a

registered address at 7901 4th Street N, St. Petersburg, Florida 33702. HEALTHBRIDGE's sole director and manager is Nguyen. HEALTHBRIDGE operates as a management services organization ("MSO") providing MID management and consulting services to physician practices in Florida — the same service offering that Elevate provides to its own clients. HEALTHBRIDGE is the vehicle through which Defendants are soliciting Elevate's clients and prospective clients using Elevate's misappropriated trade secrets. HealthBridge FL LLC and HealthBridge Solutions, LLC are different entities, and both advance HealthBridge Solutions, *i.e.*, the ENTERPRISE.

15. Defendant Doug Hiura ("HIURA") is an individual who, upon information and belief, resides in the State of California. Elevate formerly employed HIURA as Vice President of Provider Relations. In that capacity, HIURA had access to Elevate's confidential and proprietary information, including client relationships, physician referral sources, operational workflows, credentialing processes, and business development methodology. After departing Elevate in or about July 2025, HIURA simultaneously served as a paid contractor for AOMED, an Elevate client, while secretly designing, structuring, and building the ENTERPRISE — a direct competitor to Elevate. HIURA held a 25% equity stake in the ENTERPRISE as its designated Chief Operating Officer, with tie-breaking authority over all operational decisions.

## FACTUAL ALLEGATIONS

### A. Elevate's Business and Trade Secrets

16. Elevate provides specialty pharmacy services, including MID management, in-office infusion program management, and related consulting services to physician practices across the United States. In developing and operating these programs, Elevate has invested substantial time, effort, and resources to develop proprietary and confidential information that gives it a competitive advantage in the marketplace.

17. Elevate's trade secrets include, but are not limited to, the following: (a) proprietary financial modeling tools and pro forma methodologies, including the building tools, inputs, assumptions, historical benchmarks, fee structures, calculation logic, and analytical frameworks Elevate developed and refined to price, evaluate, and project MID and infusion opportunities; (b) patient census and active patient data, including patient identities, clinic-specific patient volumes, and transition information for patients Elevate was actively managing; (c) physician referral source information, including the identities, contact information, referral patterns, and relationship history of referring physicians; (d) credentialing and onboarding workflows, including checklists, insurer-enrollment steps, provider-document requirements, sequencing, and timing for onboarding a

practice; (e) client contractual terms and operational playbooks, including client-specific scope, fees, reimbursement terms, implementation steps, and methods for launching and operating MID and in-office infusion programs; (f) standard operating procedures, order sets, and related workflows governing intake, benefits investigation, prior authorization, drug ordering, dispensing, billing, reconciliation, and service delivery; (g) client lead and pipeline data maintained in Elevate's HubSpot Customer Relationship Management ("CRM"), including prospect identities, account status, pipeline stage, contacts, notes, and follow-up priorities; (h) formulary, drug-opportunity, reimbursement, and margin data, including the IRIS Formulary information identifying drugs, opportunities, reimbursement amounts, and margins; and (i) Elevate's Statement of Work ("SOW") and Master Services Agreement ("MSA") templates, including template language, service descriptions, fee and operational provisions, dates, and party-specific terms used to contract with and onboard clients.

18. Each of the above nine categories derives independent economic value, actual or potential, from secrecy. Elevate assembled these categories from non-public client records, account-specific operating experience, negotiated contractual terms, historical performance data, internal analyses, and employee-developed processes; they are not generally known or readily ascertainable through proper means by competitors. Specifically, the pro forma

tools and benchmarks enable a competitor to price opportunities, project revenue and margins, and prepare client pitches without incurring Elevate's development costs. Patient census and referral-source information identify active patients, physicians, and relationships that a competitor could use to plan a clinic transition or target referral business. Credentialing workflows, Standard Operating Procedures ("SOPs"), order sets, and operational playbooks enable a competitor to launch and operate MID or infusion services while avoiding the time and expense of developing Elevate's implementation methods. Client terms and SOW/MSA templates reveal how Elevate structures scope, pricing, reimbursement, and operations and can be repurposed to accelerate competing contracting. HubSpot pipeline data identifies prospects Elevate developed at its expense and allows a competitor to prioritize and pursue them. Formulary and margin data reveal which drugs and opportunities may be commercially attractive and how reimbursement and profitability are calculated.

19. Disclosure or use of any of the nine categories identified above provides a competitor with information and processes that cannot be obtained from public sources without duplicating Elevate's investment and client-specific work.

20. To that end, Elevate has taken reasonable measures to maintain the secrecy of these materials. Elevate requires employees to comply with

nondisclosure and confidentiality obligations, including obligations arising from employment agreements and other restrictive covenants that survived termination. Access to SharePoint, HubSpot, and related operational systems was assigned by job role, user credentials, account permissions, and need-to-know limitations; employees were not authorized to access client or operational materials outside their assigned functions. Moreover, Elevate marked confidential documents and maintained sensitive client, credentialing, formulary, financial, and workflow materials within its corporate systems rather than making them publicly available. Password-protected credentials and account-specific passwords or PINs further restricted access to client systems and onboarding materials.

21. Elevate prohibited the use of personal email accounts to route Elevate documents, confirming that the materials were subject to access and confidentiality controls.

**B. PENA's Role, Access, and Prior Identical Conduct**

22. PENA held the title of Senior Vice President of Sales at Elevate and had direct access to virtually every aspect of Elevate's competitive operations, including client relationships, physician referral sources, patient data, proprietary financial modeling tools, and onboarding and credentialing

workflows. His position of trust gave him broad visibility into the Company's most sensitive information.

23. Importantly, in May 2017, PENA's former employer, Empire Specialty Pharmacy Corp. ("Empire"), filed a federal lawsuit in the United States District Court for the District of New Jersey (Case No. 2:17-cv-03638) against PENA and his wife, Eva Lichonczak, alleging misappropriation of trade secrets, tortious interference, unfair competition, and civil conspiracy. Empire alleged that PENA and Lichonczak left Empire without notice, joined a competitor (Curexa Specialty Pharmacy), and used confidential patient and physician referral information to solicit Empire's business. Empire alleged it lost at least twenty referring physicians and estimated losses exceeding two million dollars per month as a result of PENA's conduct.

24. PENA is now repeating this same pattern of conduct with respect to Elevate. Had Elevate been aware of PENA's prior lawsuit and the facts alleged therein, Elevate would not have hired PENA or entrusted him with access to its confidential information and client relationships.

**C. Forming the "Enterprise" – A HealthBridge Conspiracy**

25. Beginning no later than April 2025, while Elevate still employed HIURA as Vice President of Provider Relations, he began secretly planning the formation of a competing enterprise. In April 2025, HIURA disclosed his plan

to John Doe, Elevate's then-Senior Director of Sales Operations, explaining that he intended to have Elevate complete the credentialing for its client AOMED and then engineer AOMED's departure from Elevate so that HIURA, upon his resignation, could independently operate the MID services with the assistance of Nguyen and HEALTHWAVE. HIURA formed a company called MIDRx while he was still employed at Elevate and simultaneously serving as a paid contractor for AOMED. Together with PENA, HIURA subsequently approached John Doe about joining an expanded competing entity that would compete directly with Elevate.

26. On or about May 31, 2025, at the California Rheumatology Association conference, HIURA and PENA met in person with John Doe to discuss the competing enterprise. The following day, HIURA and PENA visited physician practices and attempted to solicit business for their planned competing venture rather than for Elevate — their then-current employer.

27. From April 2025 through January 2026, HIURA and PENA engaged in near-daily telephone calls — often two to three times per day — with co-conspirators to coordinate the competing enterprise. Approximately seventy percent of the identified conversations related to diverting Elevate's business to the competing venture.

28. HIURA departed Elevate in or about July 2025, after spending months in a position of trust and access while secretly laying the groundwork

for a direct competitor. Upon his departure, HIURA immediately accelerated the formation of the ENTERPRISE, leveraging the confidential operational knowledge, client relationships, and business development methodology he had acquired during his tenure at Elevate.

29. On or about November 23, 2025, HIURA organized a WhatsApp group communication channel with participants including Nguyen (owner of HEALTHWAVE), PENA, and John Doe. This channel served as the primary coordination hub for the conspiracy and marks the formal beginning of coordinated planning for HealthBridge Solutions, *i.e.*, the ENTERPRISE. This planning occurred while PENA and John Doe remained on Elevate's payroll. WhatsApp messages are transmitted through Meta's servers located in multiple U.S. states, constituting interstate wire transmissions. The co-conspirators specifically chose this platform because they believed WhatsApp messages could be deleted without recovery, evidencing consciousness of guilt.

30. In or around December 2025, PENA invited Jane Doe, Elevate's then-employee, to communicate on WhatsApp. The WhatsApp messages between Jane Doe and PENA from late December 2025 through March 2026 contain extensive evidence of coordination regarding IRIS, the competing venture, and efforts to divert Elevate's clients and business.

31. Between November and December 2025, electronic communications among the co-conspirators show intensive coordination,

including: (a) on November 30, 2025, the group settled on the ENTERPRISE's official name, "HealthBridge Solutions," and Nguyen purchased the domain HealthBridgeSolutions.health; (b) on December 2, 2025, HIURA and a co-conspirator met with attorney Greg Garcia to begin forming the LLC, with the co-conspirator advising the group to keep the paper trail at a minimum for PENA and himself for the moment — evidence of conscious wrongdoing; (c) on December 6–7, 2025, HIURA circulated a draft Operating Agreement for HealthBridge Solutions, LLC, which was slated to serve as the ENTERPRISE's legal vehicle to conduct its business (legal or otherwise), establishing equal 25% ownership among the four founders; (d) on December 14, 2025, Nguyen urged rapid finalization of the partnership agreement, anticipating a February 2026 launch; and (e) on December 17, 2025, Nguyen shared confidential pharmacy pricing and reimbursement data with the group.

32. The draft Operating Agreement for HealthBridge Solutions, LLC designated (1) HIURA as Chief Operating Officer; (2) PENA as Chief Revenue Officer; (3) Nguyen as Chief Pharmacist Officer; and (4) a fourth co-conspirator as Chief Financial Officer. The draft confirmed (5) that HIURA would hold tie-breaking authority for operational decisions; (6) that the company was structured as an MSO to circumvent Corporate Practice of Medicine regulations; (7) a planned revenue target of $5 million in 2026 with 10 accounts; and (8) a target sale valuation of $20 to $40 million.

33. HIURA coordinated directly with an attorney to structure the LLC, established HEALTHBRIDGE's banking and tax identification infrastructure, managed PSAO enrollment and EHR access setup, and drafted Management Services Agreements and Statements of Work for the competing enterprise — all the operational machinery required to launch a functioning competitor to Elevate. HIURA's deep familiarity with Elevate's MID program, client relationships, operational workflows, and business development methodology, acquired during his employment, formed the foundation for HEALTHBRIDGE's business model and service offerings.

34. On February 12, 2026 — while PENA was still employed by Elevate — HEALTHBRIDGE was formed as a Florida limited liability company with Nguyen as the sole manager.

35. The formation of HEALTHBRIDGE with Nguyen as the sole manager was designed to conceal PENA and HIURA's involvement. Indeed, several weeks after the formation of HEALTHBRIDGE FL LLC, PENA indicated in text messages that he was pleased that his name did not appear on the Sunbiz page for HEALTHBRIDGE FL LLC.

## D. The IRIS Client Account and Orchestrated Takeover

36. IRIS is a physician clinic that was one of Elevate's clients. While still employed by Elevate, PENA actively worked with IRIS to plan a transition

of the clinic's MID services from Elevate to HEALTHBRIDGE, without Elevate's knowledge or consent.

37. Upon information and belief, PENA executed a nondisclosure agreement with Dr. Valenzuela (IRIS) in or about January or February 2026 — while still employed by Elevate — formalizing his participation in the competing enterprise's takeover of an Elevate client account during his employment.

38. PENA informed his HEALTHBRIDGE co-founders that "IRIS is all set for us to take over" in early February 2026. He coordinated the 30-day notice period for IRIS to terminate its relationship with Elevate, timed to coincide with HEALTHBRIDGE's operational readiness and PENA's planned resignation from Elevate. PENA also drafted the termination letter that IRIS sent to Elevate.

39. PENA also shared sensitive IRIS operational data with his HEALTHBRIDGE co-founders while still on Elevate's payroll, including patient volume information for MID utilization and monthly infusion rates — information that constitutes Elevate's confidential business data.

40. PENA engineered the IRIS termination by systematically blocking Elevate's Operations and clinical leadership from direct communication with the clinic, insisting all contact flow through him, and preventing Elevate from building independent client relationships with the IRIS practice.

41. PENA also coordinated closely with Jane Doe to plan and execute the IRIS diversion. For example, on January 22, 2026, while coordinating with PENA, Jane Doe proposed titling a meeting "IRIS Offboarding Plan," demonstrating a coordinated effort to terminate IRIS's relationship with Elevate and transfer the account to HEALTHBRIDGE. PENA's response that he "[d]efinitely don't want Howard on it" — referring to Elevate's Vice President – reveals the conspirators' deliberate efforts to conceal the scheme from Elevate's leadership.

42. Following the termination of Elevate's contract with IRIS, HEALTHWAVE began providing MID management services at the IRIS clinic. PENA was physically observed visiting the IRIS clinic and working directly with Jane Doe while still employed by Elevate.

43. PENA, on information and belief, arranged for Jose Gonzalez, a former Elevate pharmacist, to visit rheumatology practices on behalf of HEALTHWAVE to solicit business. After PENA engineered Gonzalez's termination from Elevate on performance pretexts, PENA immediately reinvited Gonzalez to IRIS alongside Nguyen to build out HEALTHBRIDGE's program.

## E. Pro Formas—Direct Evidence of Trade Secret Misappropriation

44. John Doe, in his role as Elevate's Senior Director of Sales Operations, was responsible for developing financial pro formas and projections for Elevate's MID program opportunities. In this capacity, John Doe accessed and used Elevate's proprietary pro forma methodologies, financial modeling tools, analytical frameworks, and historical performance data to create financial projections for prospective and existing client accounts.

45. John Doe created financial pro formas for the ENTERPRISE using Elevate's proprietary pro forma methodologies, financial modeling tools, and analytical frameworks. He developed these pro formas using the same proprietary processes, data inputs, and analytical approaches that he developed and refined during his employment at Elevate, and which constitute Elevate's trade secrets.

46. The pro formas created for HEALTHBRIDGE incorporated Elevate's proprietary information, including: (a) Elevate's methodology for projecting MID program revenue and profitability; (b) Elevate's analytical frameworks for evaluating physician practice opportunities; (c) historical performance data and benchmarks derived from Elevate's client accounts; (d) proprietary assumptions and variables developed by Elevate for financial modeling; and (e) Elevate's approach to structuring fee arrangements and service offerings.

47. The use of Elevate's proprietary pro forma methodologies gave HEALTHBRIDGE an unfair competitive advantage by allowing the competing enterprise to develop sophisticated financial projections and client proposals without investing the time, effort, and resources that Elevate expended in developing these proprietary tools and analytical frameworks.

48. PENA and Jane Doe specifically requested access to Elevate's proprietary pro forma building tool and other proprietary financial modeling tools. This request was flagged as inappropriate and denied. However, another co-conspirator — who had legitimate access to these tools as part of his job responsibilities — was able to misappropriate this proprietary information for use in the competing enterprise.

### F. The Co-Conspirators Encouraged Misappropriation by Elevate Employees

49. While still employed at Elevate, PENA encouraged other Elevate employees to misappropriate Elevate's proprietary intellectual property and transfer it directly to PENA for use in building the competing enterprise.

50. Upon information and belief, at least one now-former Elevate employee, PENA's spouse, was brought into Elevate at PENA's request specifically to facilitate his data theft operation from the inside.

51. Between January and March 2026, the co-conspirators used a Support@HEALTHBRIDGE.Health email address as a central hub to route

Elevate's proprietary documents among the co-conspirators. Nguyen sent documents to this address, which were then forwarded to PENA and Jane Doe's personal email addresses. This pattern of communication through a shared HEALTHBRIDGE email account — rather than through Elevate's corporate systems — evidences a coordinated communication channel used to plan and execute the scheme while minimizing the paper trail within Elevate's systems.

52. On January 27, 2026, Jane Doe emailed the IRIS Formulary – proprietary financial information constituting Elevate trade secrets – to Support@HEALTHBRIDGE.Health. Upon information and belief, Jane Doe transmitted this document at PENA's direction.

53. Together with her husband (also an Elevate employee), Jane Doe provided PENA with confidential client lead information captured from Elevate's HubSpot CRM — constituting a deliberate act of data theft on behalf of PENA and the competing enterprise. These Elevate employees used the information to arrange client meetings on PENA's behalf with prospective clients that a Senior Sales Account Manager had been cultivating, while simultaneously continuing to extract proprietary data from inside Elevate's systems. At least one of those prospects was subsequently closed as a deal under PENA's competing MID venture while PENA remained employed at Elevate, resulting in a direct, quantifiable financial loss to Elevate.

54. PENA directed Elevate employees to operate simultaneously on behalf of both Elevate and the ENTERPRISE. For example, on February 3, 2026, PENA asked Jane Doe to call a contact at IRIS, to which she responded, "On behalf of [the ENTERPRISE] or elevate?" This exchange demonstrates that Jane Doe needed to clarify which entity she was acting for at any given moment.

55. On February 12, 2026 – the same date HEALTHBRIDGE was formed – Jane Doe texted PENA: "Raul I'm plotting and have ways to take down these other accounts" and "I hate it here."

56. PENA also encouraged Elevate employees to actively obstruct Elevate's internal operations by blocking the advancement of client implementations, causing direct operational and financial harm to Elevate while facilitating the diversion of business opportunities to HEALTHBRIDGE and HEALTHWAVE.

57. For example, on March 12, 2026, PENA shared with Jane Doe a draft email to Craig Mears requesting transition to independent contractor status, in which PENA admitted he would "continue to work on closing sales even off the books." Jane Doe coached PENA on legal strategy, advising him: "I think you should wait until you hear back regarding the HR stuff. I also would exclude parts about feeling marginalized working off the books and being separated. It weakens your leverage and puts you in a bad spot legally

with them and vice versa." Jane Doe further texted: "if anybody asks me I didn't even realize there was a call. That's my story" — referring to a call with Upland Rheumatology clinic that she had sabotaged.

58. PENA also coordinated with Elevate employees on the operational unwinding of Elevate's IRIS account while simultaneously obtaining IRIS provider credentials. On January 26 and 27, 2026, Jane Doe texted PENA that "Daniel [is] going to IRIS on the 9th to collect equipment" and advised PENA that IRIS would be "switch[ing] all the login information for Scriptmax back to Dr. Perez." Jane Doe sent PENA IRIS provider licenses and DEA licenses — credentials needed to onboard IRIS with a new service provider, facilitating the operational transition from Elevate to HEALTHBRIDGE. PENA directed each of these actions.

59. The misappropriation of Elevate's proprietary pro forma methodologies for use by the ENTERPRISE establishes that co-conspirators were actively participating in the competing enterprise's efforts to solicit physician clients using Elevate's misappropriated proprietary materials. Electronic communications confirm that one co-conspirator was designated as HEALTHBRIDGE's Chief Financial Officer with a 25% equity stake, making him directly responsible for the financial modeling and projections that would be used to pitch prospective clients — projections built using Elevate's trade secrets.

### G. Nguyen's and HEALTHWAVE's Participation

60. Nguyen is the sole director and manager of HEALTHBRIDGE and the owner of HEALTHWAVE. He held a 25% equity stake as Chief Pharmacist Officer in HealthBridge Solutions, LLC (and therefore, the ENTERPRISE).

61. In or about January 2026, PENA brought Nguyen to Elevate's Upland Rheumatology clinic and falsely presented him to clinic staff as a contractor for Elevate. This false representation enabled Nguyen to gain access to the clinic, its staff, and its confidential patient data — access Elevate had not authorized. Jane Doe subsequently transmitted the Upland patient data to PENA, who had it printed at a FedEx facility and shared it directly with Nguyen. This conduct constitutes unauthorized access, reproduction, and disclosure of protected health information.

62. Nguyen purchased the HEALTHBRIDGE domain, completed the LLC questionnaire for the formation of the entity, shared confidential pharmacy pricing and reimbursement data with co-founders, and offered to temporarily cover the salaries of other HEALTHBRIDGE partners to reduce their financial dependence on Elevate income and facilitate their departure.

63. Indeed, the co-conspirators used the email address Support@HEALTHBRIDGE.Health to route confidential and proprietary information and documents from Elevate to Nguyen and the competing enterprise.

64. The corporate link between HEALTHBRIDGE and HEALTHWAVE — with Nguyen as the sole director and owner of both entities — establishes that the IRIS takeover by HEALTHWAVE and the Florida MSO operations conducted through HEALTHBRIDGE are part of a single coordinated enterprise and that Defendants are the direct beneficiaries of the trade secrets misappropriated from Elevate.

## H. Unauthorized Access to Proprietary Information

65. In or about January 2026, PENA made an unannounced visit to Elevate's Upland clinic. Before the visit, he requested and obtained a printed copy of the Upland patient census — a proprietary list of patients Elevate was actively managing — without authorization. He also attempted to seize operational control of the account by instructing the onsite technician to report to him rather than to her designated supervisors.

66. Jane Doe was observed accessing credentialing and onboarding documents in Elevate's SharePoint system outside her defined role. Upon information and belief, Jane Doe was acting on behalf of PENA and the competing enterprise.

## I. The Coordinated Network

67. The investigation has identified a coordinated network of individuals facilitating the diversion of Elevate's business to HEALTHWAVE

and HEALTHBRIDGE, including PENA, Nguyen, and HIURA. The evidence demonstrates that these individuals acted in concert, each performing a distinct role in the scheme to strip Elevate of its clients, employees, proprietary data, and business opportunities and redirect them to the competing enterprise.

68. PENA also hijacked the Center for Arthritis and Rheumatic Disease, a Miami-area clinic that was being developed as an Elevate account, and closed it under HEALTHBRIDGE while still employed at Elevate. Elevate employees and others participated in the hijacking of this account from Elevate's active HubSpot leads. After his termination, PENA, upon information and belief, closed at least one additional deal sourced from Elevate's stolen HubSpot leads that Jane Doe provided.

69. The Defendants' scheme extended to the recruitment and placement of Elevate personnel at diverted client sites. Elevate's former Clinical Specialty Pharmacist at IRIS resigned from Elevate, accepted a position with HEALTHWAVE, and simultaneously joined the MID program at the Center for Arthritis and Rheumatic Disease — the very same hijacked account. The plan was for PENA to employ former Elevate pharmacists at HEALTHWAVE and use them to solicit all accounts that Jane Doe had extracted from Elevate's HubSpot CRM.

## J. PENA's Admission

70. On March 19, 2026, PENA sent a text message to Elevate's CEO, Craig Mears, in which PENA admitted that he had officially joined an MSO that Dr. Valenzuela is a part of and that this MSO would target Dr. Valenzuela's colleagues in Puerto Rico and Florida with MID services, among other offerings. Although PENA claimed he had ensured that none of Dr. Valenzuela's colleagues were associated with Elevate and that things would remain separate with respect to IRIS, contemporaneous documentary evidence directly contradicts these assurances and establishes that PENA and his co-conspirators were actively targeting Elevate clients and using Elevate's proprietary information to do so.

71. Upon information and belief, Eva Lichonczak, PENA's wife and a co-defendant in the 2017 Empire lawsuit, was hired at Elevate at PENA's direct request in or about October 2025 to serve as a Sales Account Manager. Lichonczak remained on Elevate's payroll through December 2025 — a period that coincides precisely with the most intensive phase of HEALTHBRIDGE's formation, LLC structuring, and client diversion planning. An inspection of her Outlook account revealed that she had sent and received zero emails during her entire period of employment, her calendar contained no entries of any kind, and a MacBook purchased for her use was returned unused. This evidence strongly suggests that Lichonczak's position at Elevate may have been a ghost

employment arrangement in which she collected a salary while producing no work product, resulting in a direct financial loss to Elevate.

## K. Predicate Acts in Furtherance of the Scheme

72. The scheme described above was executed through the commission of multiple crimes ("Predicate Acts"), including (a) criminal theft of trade secrets under 18 U.S.C. § 1832; and (b) wire fraud under 18 U.S.C. § 1343.

73. The § 1832 Predicate Acts concern specific categories of Elevate Trade Secrets used in or intended for use in products or services in interstate or foreign commerce. As alleged in paragraphs 17 through 19 above, the categories are non-public financial, business, patient, client, contractual, and operational information that derives independent economic value from secrecy and that Elevate protected through confidentiality obligations, role-based access, need-to-know limits, markings, credentials, and restricted corporate systems. The representative acts below identify the category of Trade Secret, the actors, the unauthorized acquisition, copying, transmission, receipt, possession, or use, the theft, deception, breach of duty, or other improper means involved, the intended economic benefit to the ENTERPRISE, HEALTHBRIDGE FL LLC, HEALTHWAVE, or another non-Elevate actor, the intended or known injury to Elevate, and the interstate-commerce nexus for each act.

a) **HubSpot leads and pipeline.** On or about October 2, 2025, Jane Doe used personal messaging to transmit or display to PENA a screenshot of Elevate's HubSpot "Whale Prospects" pipeline, including IRIS, Upland Rheumatology, CA Rheum Associates/Articularis, Miami Rheumatology, and other prospects. The pipeline was a non-public compilation of prospect identities, account status, cultivation history, and sales priorities that reflected Elevate's investment in developing those relationships. Jane Doe had access through her Elevate role; PENA knew the information was Elevate's confidential pipeline data; and neither had authorization to provide it to the ENTERPRISE. PENA, HEALTHBRIDGE FL LLC, and HEALTHWAVE acquired, received, and used or intended to use the pipeline to arrange meetings, prioritize opportunities, and pursue the Center for Arthritis and Rheumatic Disease and other accounts Elevate had developed at its expense. The participants intended to convert the pipeline's economic value to non-Elevate actors and knew or intended that its use would injure Elevate by diverting business opportunities. The pipeline concerned Elevate's multistate client and prospect business and was transmitted through interstate electronic facilities.

b) **IRIS Formulary.** On January 27, 2026, and again on February 5, 2026, Jane Doe, acting at PENA's direction while still employed by Elevate, transmitted the IRIS Formulary spreadsheet from her personal Gmail

account to Support@HEALTHBRIDGE.Health and transmitted the Formulary PDF to PENA's personal email. The Formulary contained Elevate's non-public, client-specific drug, opportunity, reimbursement, and margin information. That compilation allowed the ENTERPRISE to assess IRIS's economics, identify commercially attractive opportunities, structure pricing, and pursue or assume IRIS's business without bearing Elevate's development costs. Jane Doe and PENA knew the transmissions were unauthorized because they used personal and HEALTHBRIDGE-controlled channels rather than Elevate's systems, and PENA acknowledged receipt by responding, "Wow thank you so much." PENA, HEALTHBRIDGE FL LLC, and HEALTHWAVE acquired, received, and used, or intended to use, the Formulary without authorization to obtain an economic benefit, advance the ENTERPISE, and injure Elevate. The Formulary concerned Elevate's interstate specialty-pharmacy services and was transmitted through interstate electronic facilities.

c) **Upland patient census and false authorization.** In or about January 2026, PENA brought Nguyen to Upland Rheumatology, where Nguyen falsely represented himself to clinic staff as an Elevate contractor even though he was acting for HEALTHWAVE and the ENTERPRISE. That deception was directed to Upland and Elevate to obtain access to Elevate-controlled patient data that Elevate had not authorized Nguyen or the

ENTERPRISE to receive. After access was obtained, Jane Doe transmitted the Upland patient census to PENA; PENA obtained and copied the census and shared it with Nguyen. The census was a non-public list of active patients Elevate was managing, compiled through Elevate's client operations and not available to competitors through public sources. Its disclosure enabled the ENTERPRISE to identify the affected patient population, plan the clinic transition, and pursue the related MID business without duplicating Elevate's work. Nguyen, PENA, and Jane Doe knew the census was Elevate's confidential patient information and acquired, received, copied, and used or intended to use it to build and operate HEALTHWAVE and HEALTHBRIDGE, pursue clinic business, and obtain an economic benefit for non-Elevate actors, knowing or intending that Elevate would be injured. The census related to Elevate's interstate MID services and was used to pursue the ENTERPRISE's multistate specialty-pharmacy business.

d) **SharePoint, onboarding, credentialing, workflow, and access materials.** Between January 13 and 27, 2026, Jane Doe, acting at PENA's direction, accessed or obtained Elevate's SharePoint onboarding and credentialing materials and transmitted from her personal Gmail account to Support@HEALTHBRIDGE.Health an Elevate-derived Statement of Work and multiple versions of the IRIS MID/Buy & Bill workflow. The

workflow described intake, benefits investigation, prior authorization, drug ordering, dispensing, billing, and reconciliation; the related materials included credentialing checklists, provider and DEA licenses, login information, and other access information. These materials reflected Elevate's non-public sequencing, documentation requirements, and implementation methods for onboarding and operating a client. Jane Doe and PENA knew the materials were Elevate-controlled and unauthorized for HEALTHBRIDGE use. PENA, HEALTHBRIDGE FL LLC, and HEALTHWAVE acquired, received, copied, and used or intended to use the onboarding materials, IRIS-specific workflows, credentials, and access information to onboard or operate IRIS and other accounts, obtain an economic benefit for non-Elevate actors, promote the ENTERPISE, and injure Elevate. The materials related to Elevate's interstate services and moved through interstate electronic facilities.

e) **SOW, Del Rosario MSA, and pro forma materials.** Jane Doe transmitted Elevate's SOW template and IRIS-specific contractual language to Support@HEALTHBRIDGE.Health in January 2026, and on March 18, 2026, edited an IRIS/HEALTHWAVE Management Services Agreement by changing the parties to HEALTHBRIDGE and Dr. Luis Del Rosario, MD, then sent the revised MSA to Support@HEALTHBRIDGE.Health and PENA's personal email. Jane Doe

demonstrated consciousness of guilt and awareness that the template originated from Elevate's proprietary documents when she stated: "That MSA template I sent wasn't elevates right?" PENA and the ENTERPRISE received it to pursue Dr. Del Rosario and other business. The SOW and MSA templates contained Elevate-developed scope, service descriptions, fee and operational provisions, dates, and other contracting terms that were not public and could be repurposed to accelerate customer contracting and onboarding. Separately, John Doe used Elevate's proprietary pro forma methodologies, financial-modeling tools, historical benchmarks, assumptions, and analytical frameworks to create pricing, financial projections, and client proposals for the ENTERPISE. Those materials embodied Elevate's non-public approach to evaluating opportunities, projecting revenue and profitability, and structuring fee arrangements. Jane Doe, John Doe, PENA, and the HEALTHBRIDGE participants acquired, copied, repurposed, received, or used these contractual and financial materials without authorization, intending to convert their value to the economic benefit of the ENTERPRISE, HEALTHBRIDGE FL LLC, HEALTHWAVE, or another non-Elevate actor and intending or knowing that Elevate would be injured. The materials were used to launch, onboard, price, and solicit interstate specialty-pharmacy and MSO business and were transmitted through interstate electronic facilities.

74. The § 1343 Predicate Acts are limited to identified interstate electronic communications, *supra* at ¶¶ 28–29, in which the participants used material concealment or a materially false instruction to induce Elevate or its agents to continue granting access, acting, or refraining from intervention, or to delay discovery and remediation, while the ENTERPRISE obtained or retained Elevate's property, access, or business opportunities. Each communication identified below states the actor, recipient or target, date, medium, concealed or false matter, why it was misleading, the action or inaction induced, the property or access obtained or retained, and how the communication furthered the scheme to defraud.

a) On January 22, 2026, Jane Doe and PENA exchanged interstate iMessages concerning an "IRIS Offboarding Plan." Jane Doe proposed that title for a meeting, and PENA responded that he "definitely [did]n't want Howard on it," referring to Elevate's Vice President. The material concealment was that PENA and Jane Doe were coordinating IRIS's transition for the ENTERPRISE while presenting themselves as Elevate personnel and excluding Elevate leadership. It was misleading because it concealed the planned diversion and prevented Elevate from evaluating or stopping the transition. The messages induced Elevate to leave PENA and Jane Doe with access to IRIS communications and information and to refrain from intervening before IRIS terminated its relationship with Elevate. The

communication thereby helped the ENTERPRISE retain and use IRIS data, workflows, credentials, and business opportunities. The messages were sent through interstate electronic facilities between participants located in different states, on information and belief, and furthered the scheme to obtain Elevate property and business through concealment.

b) On February 3, 2026, Jane Doe texted PENA asking whether she should act "On behalf of [the ENTERPRISE] or elevate?" PENA instructed her to say "Elevate." That instruction was materially false because the requested IRIS task furthered HEALTHBRIDGE's interests, not Elevate's, and was misleading in context because it caused a HEALTHBRIDGE-related task to appear Elevate-authorized. It induced Jane Doe to use Elevate access and client communications while acting for the ENTERPRISE, allowed the ENTERPRISE to obtain or retain IRIS information and business, and caused Elevate to continue granting access and refrain from intervening. The text was transmitted through interstate electronic facilities and furthered the same scheme.

c) On March 12, 2026, PENA sent Jane Doe an interstate electronic message seeking to continue working on sales "off the books." Jane Doe advised him to omit references to working off the books and being separated from Elevate and stated, regarding an Upland call she had sabotaged, "that's my story." The concealed facts were PENA's competing work and Jane Doe's

misuse of Elevate access; the concealment was material because it was intended to keep Elevate from discovering the disloyal work before the participants completed client diversions. The communications induced Elevate to continue paying PENA and Jane Doe, leave their access and authority in place, and refrain from immediate intervention, while the ENTERPRISE retained access to Elevate information and business opportunities. The messages, sent through interstate electronic facilities, furthered the scheme by preserving the fruits of the prior § 1832 thefts and client diversions.

d) On March 19, 2026, PENA sent Craig Mears an interstate text stating that he had joined an MSO associated with Dr. Valenzuela, that it would target Dr. Valenzuela's colleagues in Puerto Rico and Florida, and that matters would remain separate with respect to IRIS. The representation was materially misleading because it concealed the ENTERPRISE's use of IRIS data, workflows, credentials, Formulary, contractual materials, and client relationships to replace Elevate at IRIS and pursue related accounts. It was designed to induce Elevate to defer escalation and demands for return and remediation, thereby allowing the ENTERPRISE to retain the fruits of its use of Elevate's property and business opportunities. The communication was transmitted through interstate electronic facilities and furthered the

scheme by delaying discovery and preserving the ENTERPRISE's use of Elevate's property.

75. The Predicate Acts are related in purpose, participants, victims, methods, and results and amount to a pattern of racketeering activity. Plaintiff's primary theory is open-ended continuity: the ENTERPRISE used a repeatable method in which insiders supplied access to Elevate information, the participants used false authorization or concealment to preserve that access, the ENTERPRISE acquired Elevate's Trade Secrets and business opportunities, and HEALTHBRIDGE FL LLC and HEALTHWAVE used Elevate's information, templates, workflows, and pro formas to solicit, onboard, and service multiple clients and prospects. The method targeted or included IRIS, Upland Rheumatology, AOMED and related practice opportunities, Dr. Del Rosario, the Center for Arthritis and Rheumatic Disease, Articularis, affected patients, and other prospects and leads. These nonparty allegations show breadth, relatedness, continuity, and repeated victimization. The same participants, channels, roles, materials, and client-acquisition method were capable of repetition and continued operating in the same market. PENA's prior Empire lawsuit is supporting evidence of knowledge, intent, absence of mistake, and threat of repetition. Alternatively, the related acts extended from at least April 2025 through March 2026.

**L. Cease and Desist Demands**

76. On March 27, 2026, Elevate, through counsel, sent cease and desist letters to PENA and HEALTHBRIDGE / HEALTHWAVE / Nguyen, demanding that they immediately cease all misappropriation of Elevate's trade secrets, return all Elevate property and confidential information, submit electronic devices for forensic review, and preserve all evidence. Upon information and belief, Defendants have failed to comply with these demands.

77. All conditions precedent to the commencement of this action have occurred, been satisfied, or been waived.

78. As a result of Defendants' conduct, Elevate has been required to retain the undersigned attorneys and is obligated to pay said attorneys a reasonable fee for their services.

**COUNT I**
**TORTIOUS INTERFERENCE WITH BUSINESS RELATIONSHIPS**
**(Against All Defendants)**

79. Elevate adopts and realleges paragraphs 1 through 78 as if restated fully herein.

80. This is an action by Elevate against Defendants for tortious interference with business relationships.

81. Elevate had existing and prospective business relationships with its physician clients and referral sources, including the IRIS clinic, Upland

Rheumatology, the Center for Arthritis and Rheumatic Disease (Miami), Luis Del Rosario, MD, and other physician practices in Elevate's client pipeline.

82. Defendants had knowledge of Elevate's business relationships and prospective business relationships with these clients and referral sources.

83. Defendants intentionally and unjustifiably interfered with Elevate's business relationships through improper means, including the misappropriation and use of Elevate's trade secrets, the diversion of Elevate's clients and prospective clients to the competing enterprise, the solicitation of Elevate's clients using Elevate's own proprietary materials and confidential information, and the deliberate blocking of Elevate's operational and clinical leadership from direct communication with Elevate's clients.

84. Defendants' interference caused Elevate's business relationships to be disrupted and terminated, including the loss of the IRIS client account and the hijacking of the Center for Arthritis and Rheumatic Disease (Miami).

85. As a direct and proximate result of Defendants' tortious interference, Elevate has suffered and continues to suffer actual damages in an amount to be proven at trial.

WHEREFORE, Plaintiff, TLI ABM INC. d/b/a ELEVATE HEALTH TECHNOLOGIES, respectfully demands judgment against Defendants RAUL PENA, DOUG HIURA, HEALTHWAVE SPECIALTY PHARMACY SERVICES, and HEALTHBRIDGE FL LLC, jointly and severally, for

compensatory damages in an amount to be determined at trial, punitive damages, attorneys' fees and costs, pre-judgment and post-judgment interest, and any other and further relief this Court deems just and proper.

**COUNT II**
**CIVIL CONSPIRACY**
**(Against All Defendants)**

86. Elevate adopts and realleges paragraphs 1 through 78 as if restated fully herein.

87. This is an action by Elevate against Defendants for civil conspiracy.

88. Defendants, together with their co-conspirators, agreed and conspired to accomplish an unlawful purpose — namely, the misappropriation of Elevate's trade secrets, the diversion of Elevate's clients and business opportunities, and the establishment and operation of a competing enterprise using Elevate's proprietary information — by unlawful means.

89. In furtherance of the conspiracy, Defendants and their co-conspirators committed overt acts including, but not limited to: (a) establishing a coordinated communication channel to plan and execute the scheme, including the Support@HEALTHBRIDGE.Health email address used as a central hub for routing Elevate's proprietary documents among the co-conspirators while minimizing the paper trail within Elevate's systems; (b) forming HealthBridge Solutions, LLC with equal 25% ownership among the

co-conspirators; (c) orchestrating the termination of Elevate's IRIS client relationship to facilitate HEALTHBRIDGE's takeover, including Jane Doe's proposal of the "IRIS Offboarding Plan" meeting on January 22, 2026; (d) creating financial pro formas for HEALTHBRIDGE using Elevate's proprietary pro forma methodologies and financial modeling tools; (e) extracting confidential client lead data from Elevate's HubSpot CRM and SharePoint systems, including transmission of the "Whale Prospects" pipeline on October 2, 2025; (f) sharing Elevate's confidential patient data, IRIS operational data, formulary information, operational workflows, and client financial information with co-conspirators through the Support@HEALTHBRIDGE.Health email hub; (g) soliciting and hiring former Elevate employees to operate the competing enterprise; (h) deliberately concealing the scheme by minimizing the paper trail and using personal communication channels; and (i) misappropriating Elevate's contractual templates, including repurposing Elevate's Statement of Work by deleting "Elevate HT" references for use by HEALTHBRIDGE.

90. Defendants' conspiracy was the proximate cause of injury to Elevate.

91. As a direct and proximate result of Defendants' conspiracy, Elevate has suffered and continues to suffer actual damages in an amount to be proven at trial.

WHEREFORE, Plaintiff, TLI ABM INC. d/b/a ELEVATE HEALTH TECHNOLOGIES, respectfully demands judgment against Defendants RAUL PENA, DOUG HIURA, HEALTHWAVE SPECIALTY PHARMACY SERVICES, and HEALTHBRIDGE FL LLC, jointly and severally, for compensatory damages in an amount to be determined at trial, punitive damages, attorneys' fees and costs, pre-judgment and post-judgment interest, and any other and further relief this Court deems just and proper.

**COUNT III**
**UNFAIR COMPETITION**
**(Against All Defendants)**

92. Elevate adopts and realleges paragraphs 1 through 78 as if restated fully herein.

93. This is an action by Elevate against Defendants for unfair competition under Florida common law.

94. Defendants have engaged in unfair competition by competing against Elevate using Elevate's own proprietary materials, operational knowledge, client relationships, and trade secrets obtained through the wrongful conduct of Elevate employees. Defendants' conduct includes, but is not limited to, the use of Elevate's proprietary pro forma methodologies and financial modeling tools to develop client proposals and financial projections; the use of Elevate's confidential patient data, physician referral source information, and client lead data to identify and target business opportunities;

and the recruitment and hiring of Elevate employees who possessed Elevate's trade secrets and confidential information to operate the competing enterprise.

95. Defendants' conduct was likely to cause customer confusion.

96. Defendants' unfair competition has been and continues to be willful and deliberate.

97. As a direct and proximate result of Defendants' unfair competition, Elevate has suffered and continues to suffer actual damages in an amount to be proven at trial.

WHEREFORE, Plaintiff, TLI ABM INC. d/b/a ELEVATE HEALTH TECHNOLOGIES, respectfully demands judgment against Defendants RAUL PENA, DOUG HIURA, HEALTHWAVE SPECIALTY PHARMACY SERVICES, and HEALTHBRIDGE FL LLC, jointly and severally, for compensatory damages in an amount to be determined at trial, punitive damages, disgorgement of profits, attorneys' fees and costs, pre-judgment and post-judgment interest, and any other and further relief this Court deems just and proper.

**COUNT IV**
**UNFAIR COMPETITION UNDER CALIFORNIA BUSINESS & PROFESSIONS CODE § 17200**
**(Against All Defendants)**

98. Elevate adopts and realleges paragraphs 1 through 78 as if restated fully herein.

99. This is an action for unfair competition under California Business & Professions Code § 17200, et seq. (the "UCL"). This Court may exercise supplemental jurisdiction over this claim pursuant to 28 U.S.C. § 1367, as it arises from the same case or controversy as the federal claims.

100. The UCL prohibits any "unlawful, unfair, or fraudulent business act or practice." Cal. Bus. & Prof. Code § 17200. Defendants have engaged in unlawful, unfair, and fraudulent business acts and practices in violation of the UCL.

101. Defendants' conduct is "unlawful" under the UCL because it violates the Defend Trade Secrets Act (18 U.S.C. § 1836), the California Uniform Trade Secrets Act (Cal. Civ. Code § 3426), the Florida Uniform Trade Secrets Act (Fla. Stat. § 688.001), the Health Insurance Portability and Accountability Act (45 C.F.R. §§ 164.502 and 164.514), and California's Confidentiality of Medical Information Act (Cal. Health & Safety Code § 56.10 et seq.).

102. Defendants' conduct is "unfair" under the UCL because the harm caused by their conduct to Elevate, to competition, and to the public interest substantially outweighs any utility of their conduct, and because Defendants' conduct violates established public policies embodied in state and federal trade secret, privacy, and healthcare laws.

103. Defendants' conduct is "fraudulent" under the UCL because: (a) Nguyen deliberately misrepresented himself to the staff at Upland Rheumatology as a contractor for Elevate to gain access to the clinic and its confidential patient data, when in fact he was a founding partner and 25% equity holder in the ENTERPRISE, a direct competitor to Elevate that was formed to divert Elevate's clients; and (b) PENA and HIURA, while employed by Elevate as Senior Vice President of Sales and Vice President of Provider Relations, respectively, expressly and impliedly represented to Elevate that they were loyal employees working for Elevate's benefit in exchange for their salaries and benefits, when in fact they were secretly working for their own competing enterprise, serving as HealthBridge Solutions, LLC's designated Chief Revenue Officer and Chief Operating Officer with 25% equity stakes each. This conduct constitutes fraud and misrepresentation designed to deceive both healthcare facility staff and Elevate for competitive advantage.

104. Defendants' conduct also constitutes "unfair" and "unlawful" business practices under the UCL because PENA and HIURA converted Elevate's compensation to their own use by accepting salaries and benefits from Elevate while secretly devoting their time, effort, and attention to building the ENTERPRISE — a direct competitor. Rather than providing the loyal service for which they were being compensated, PENA and HIURA used company time and resources to plan and execute the competing enterprise,

divert Elevate's clients, recruit Elevate's employees, and misappropriate Elevate's trade secrets. This wage theft was willful, intentional, and in conscious disregard of Elevate's rights, and deprived Elevate of the value of the compensation it paid.

105. Defendant HEALTHWAVE is a California business entity that engaged in unfair business practices in California by receiving and using Elevate's misappropriated trade secrets, patient data, and client relationships to compete directly against Elevate. Defendant HEALTHBRIDGE FL LLC, though a Florida entity, is owned and controlled by Nguyen, a California resident, and operates in coordination with HEALTHWAVE to divert Elevate's California-based business opportunities.

106. As a direct and proximate result of Defendants' unfair business practices, Elevate has suffered injury in fact and has lost money or property.

WHEREFORE, Plaintiff, TLI ABM INC. d/b/a ELEVATE HEALTH TECHNOLOGIES, respectfully demands judgment against Defendants RAUL PENA, DOUG HIURA, HEALTHWAVE SPECIALTY PHARMACY SERVICES, and HEALTHBRIDGE FL LLC, jointly and severally, for restitution, disgorgement of ill-gotten gains, temporary, preliminary, and permanent injunctive relief, attorneys' fees and costs, and any other and further relief this Court deems just and proper.

**COUNT V**
**UNJUST ENRICHMENT**
**(Against All Defendants)**

107. Elevate adopts and realleges paragraphs 1 through 78 as if restated fully herein.

108. This is an action by Elevate against Defendants for unjust enrichment.

109. Elevate conferred a benefit upon Defendants through the development and maintenance of its trade secrets, proprietary information, client relationships, and operational infrastructure, which Defendants have wrongfully taken and used for their own commercial advantage.

110. Defendants knowingly and voluntarily accepted and retained the benefit of Elevate's trade secrets and proprietary information by using them to establish and operate a competing enterprise, solicit Elevate's clients, and generate revenue and profits.

111. The circumstances render Defendants' retention of this benefit inequitable and unjust. It would be unconscionable for Defendants to retain the benefit of Elevate's trade secrets, proprietary information, and client relationships without compensating Elevate for the value they received.

112. As a direct and proximate result of Defendants' unjust enrichment, Elevate has suffered and continues to suffer actual damages in an amount to be proven at trial.

WHEREFORE, Plaintiff, TLI ABM INC. d/b/a ELEVATE HEALTH TECHNOLOGIES, respectfully demands judgment against Defendants RAUL PENA, DOUG HIURA, HEALTHWAVE SPECIALTY PHARMACY SERVICES, and HEALTHBRIDGE FL LLC, jointly and severally, for disgorgement of all profits earned through the use of Elevate's trade secrets and proprietary information, restitution, pre-judgment and post-judgment interest, and any other and further relief this Court deems just and proper.

**COUNT VI**
**BREACH OF DUTY OF LOYALTY**
**(Against Defendants PENA and HIURA)**

113. Elevate adopts and realleges paragraphs 1 through 78 as if restated fully herein.

114. This is an action by Elevate against Defendants PENA and HIURA for breach of their respective duties of loyalty.

115. As employees and officers of Elevate, PENA (holding the title of Senior Vice President of Sales) and HIURA (holding the title of Vice President of Provider Relations) each owed Elevate a duty of loyalty, including the duty to act in good faith and in the best interests of Elevate, and the duty not to compete with Elevate, divert its business opportunities, or misappropriate its confidential information during their employment.

116. PENA breached his duty of loyalty by, among other things: (a) secretly co-founding HealthBridge Solutions, LLC — a direct competitor —

while employed by Elevate and serving as its Chief Revenue Officer with a 25% equity stake; (b) orchestrating the termination of Elevate's IRIS client relationship and redirecting the client to HEALTHBRIDGE/HEALTHWAVE; (c) sharing Elevate's confidential client data, including IRIS patient volumes and MID revenue figures, with his HEALTHBRIDGE co-founders while still on Elevate's payroll; (d) diverting the Center for Arthritis and Rheumatic Disease account from Elevate to HEALTHBRIDGE while still employed by Elevate; (e) obtaining the Upland patient census without authorization and sharing it with Nguyen; and (f) soliciting Elevate employees and contractors to join the competing enterprise.

117. HIURA breached his duty of loyalty by, among other things: (a) forming MIDRx, a competing company, in or about April 2025 while still employed by Elevate and serving as a paid contractor for AOMED, an Elevate client, with the stated plan of engineering AOMED's termination of its Elevate relationship; (b) co-founding HealthBridge Solutions, LLC as its designated Chief Operating Officer with a 25% equity stake, and designing, structuring, and building the competing enterprise from the ground up using operational knowledge acquired during his Elevate tenure; (c) creating and managing the communication channel that served as the primary coordination hub for the conspiracy; (d) recruiting Elevate employees into the competing enterprise while they remained employed at Elevate; (e) coordinating the formation of

HEALTHBRIDGE as a vehicle to solicit Elevate's Florida physician clients; and (f) structuring the LLC formation to minimize the paper trail linking co-conspirators who remained employed at Elevate to the competing entity.

118. As a direct and proximate result of PENA's and HIURA's breaches of their respective duties of loyalty, Elevate has suffered and continues to suffer actual damages in an amount to be proven at trial.

WHEREFORE, Plaintiff, TLI ABM INC. d/b/a ELEVATE HEALTH TECHNOLOGIES, respectfully demands judgment against Defendants RAUL PENA and DOUG HIURA, jointly and severally, for compensatory damages in an amount to be determined at trial, punitive damages, disgorgement of profits, attorneys' fees and costs, pre-judgment and post-judgment interest, and any other and further relief this Court deems just and proper.

**COUNT VII**
**VIOLATION OF CALIFORNIA LABOR CODE §§ 2860 AND 2863**
**(BREACH OF DUTY OF LOYALTY)**
**(Against Defendants PENA and HIURA)**

119. Elevate adopts and realleges paragraphs 1 through 78 as if restated fully herein.

120. This is an action for breach of the statutory duty of loyalty under California Labor Code § 2863. This Court may exercise supplemental jurisdiction over this claim pursuant to 28 U.S.C. § 1367, as it arises from the same case or controversy as the federal claims.

121. California Labor Code § 2863 provides that an employee who has any business to transact on his own account, similar to that entrusted to him by his employer, shall always give the preference to the business of the employer. California Labor Code § 2860 further provides that an employee shall use such skill as he possesses, so far as the same is required, for the service specified. These provisions codify the common law duty of loyalty owed by employees to their employers under California law.

122. Defendants PENA and HIURA are California residents who were employed by Elevate in positions of trust and responsibility. PENA held the title of Senior Vice President of Sales, and HIURA held the title of Vice President of Provider Relations. In these capacities, PENA and HIURA were entrusted with Elevate's most sensitive confidential and proprietary information, including client relationships, physician referral sources, patient data, proprietary financial modeling tools, credentialing and onboarding workflows, and operational procedures.

123. While still employed by Elevate, PENA and HIURA breached their statutory duty of loyalty by secretly co-founding HealthBridge Solutions, LLC — a direct competitor to Elevate in the specialty pharmacy services industry — and by preferring their own competing business interests over those of their employer. Specifically, PENA and HIURA: (a) formed and structured a competing enterprise while drawing salaries from Elevate; (b) diverted

Elevate's business opportunities, including the IRIS client account and the Center for Arthritis and Rheumatic Disease, to their competing venture; (c) recruited other Elevate employees to join the competing enterprise; (d) shared Elevate's confidential business information, including patient data, client operational data, and financial projections, with their co-conspirators; and (e) coordinated the timing of client terminations to coincide with their planned departures from Elevate.

124. HIURA's conduct is particularly egregious because he formed a competing company called MIDRx while still employed at Elevate and while simultaneously serving as a paid contractor for AOMED, an Elevate client. This conduct represents a triple breach of fiduciary duty: HIURA was collecting compensation from Elevate as an employee while owing Elevate a duty of loyalty; he was simultaneously being paid as a contractor by one of Elevate's own clients; and he was actively planning to divert that very client relationship away from Elevate to his own competing venture — all for his personal financial gain. HIURA's stated plan was to engineer AOMED's termination of its Elevate relationship, after which he would resign from Elevate and assume control of AOMED's MID services independently. HIURA subsequently co-founded HealthBridge Solutions, LLC as its designated Chief Operating Officer with a 25% equity stake, using the operational knowledge,

client relationships, and business development methodology he had acquired during his tenure at Elevate.

125. PENA's conduct mirrors the identical conduct for which he was previously sued by his former employer, Empire Specialty Pharmacy Corp., in 2017 (Case No. 2:17-cv-03638), which alleged that PENA left Empire without notice, joined a competitor, and used confidential patient and physician referral information to solicit Empire's business. PENA repeated this pattern at Elevate by secretly joining HealthBridge Solutions as its Chief Revenue Officer with a 25% equity stake while still employed by Elevate, orchestrating the termination of Elevate's IRIS client relationship, and sharing confidential IRIS operational data with his HEALTHBRIDGE co-founders.

126. As a direct and proximate result of PENA's and HIURA's breaches of their statutory duty of loyalty under California Labor Code § 2863, Elevate has suffered and continues to suffer actual damages in an amount to be proven at trial.

WHEREFORE, Plaintiff, TLI ABM INC. d/b/a ELEVATE HEALTH TECHNOLOGIES, respectfully demands judgment against Defendants RAUL PENA and DOUG HIURA, jointly and severally, for compensatory damages in an amount to be determined at trial, disgorgement of profits, punitive damages, attorneys' fees and costs, pre-judgment and post-judgment interest, and any other and further relief this Court deems just and proper.

**COUNT VIII**
**FRAUD**
**(Against Defendants PENA and HIURA)**

127. Elevate adopts and realleges paragraphs 1 through 78 as if restated fully herein.

128. This is an action for common law fraud against Defendants PENA and HIURA.

129. As employees of Elevate, PENA and HIURA expressly and impliedly represented to Elevate that they were loyal employees working for Elevate's benefit in exchange for their salaries, benefits, and other compensation. These representations were made through their continued acceptance of employment, their participation in company meetings and operations, and their day-to-day conduct holding themselves out as Elevate employees dedicated to advancing Elevate's business interests.

130. These representations were false. While accepting salaries and benefits from Elevate, PENA and HIURA were secretly working for HealthBridge Solutions, LLC, the vehicle for their own competing enterpise. PENA served as HEALTHBRIDGE's designated Chief Revenue Officer with a 25% equity stake, and HIURA served as HEALTHBRIDGE's designated Chief Operating Officer with a 25% equity stake and tie-breaking authority over all operational decisions. Rather than working to advance Elevate's business interests, PENA and HIURA were actively working to divert Elevate's clients,

recruit Elevate's employees, and build a direct competitor using Elevate's trade secrets and confidential information — all while drawing salaries from Elevate.

131. PENA and HIURA knew their representations of loyalty and dedicated service were false at the time they made them. Electronic communications, LLC formation documents, and the draft Operating Agreement for HealthBridge Solutions, LLC establish that PENA and HIURA were actively planning and building the competing enterprise during the same period they were representing themselves as loyal Elevate employees.

132. PENA and HIURA made these false representations with the intent to induce Elevate to continue paying them salaries, benefits, and other compensation, and to continue providing them with access to Elevate's confidential information, client relationships, and business operations — access they exploited to build the competing enterprise.

133. Elevate justifiably relied on PENA's and HIURA's representations of loyalty and dedicated service. Elevate continued to pay PENA and HIURA their full salaries and benefits, continued to provide them with access to confidential information and client relationships, and continued to entrust them with senior leadership responsibilities — all in reliance on their implicit and explicit representations that they were working for Elevate's benefit.

134. As a direct and proximate result of PENA's and HIURA's fraud, Elevate has suffered damages including, but not limited to: (a) all salaries, benefits, and compensation paid to PENA and HIURA during the period they were secretly working for HEALTHBRIDGE; (b) the value of the business opportunities diverted to HEALTHBRIDGE during this period; (c) the costs of investigating and remediating the fraud; and (d) other consequential damages in an amount to be proven at trial.

135. PENA's and HIURA's fraud was willful, wanton, and malicious, entitling Elevate to an award of punitive damages.

WHEREFORE, Plaintiff, TLI ABM INC. d/b/a ELEVATE HEALTH TECHNOLOGIES, respectfully demands judgment against Defendants RAUL PENA and DOUG HIURA, jointly and severally, for compensatory damages in an amount to be determined at trial, punitive damages, disgorgement of all compensation paid during the period of fraud, attorneys' fees and costs, pre-judgment and post-judgment interest, and any other and further relief this Court deems just and proper.

**COUNT IX**
**FRAUDULENT CONCEALMENT**
**(Against Defendants PENA and HIURA)**

136. Elevate adopts and realleges paragraphs 1 through 78 as if restated fully herein.

137. This is an action for fraudulent concealment against Defendants PENA and HIURA.

138. As senior officers of Elevate occupying positions of trust and confidence — PENA as Senior Vice President of Sales and HIURA as Vice President of Provider Relations — PENA and HIURA owed Elevate a duty to disclose material facts affecting their loyalty and the performance of their duties, including the existence of any competing business activities or conflicts of interest.

139. PENA and HIURA deliberately concealed from Elevate the existence of HealthBridge Solutions, LLC, their ownership stakes and executive roles in the ENTPERISE, their plans to divert Elevate's clients to the ENTERPRISE, and their active efforts to build a competing enterprise while employed by Elevate. This concealment was intentional and calculated.

140. The facts concealed by PENA and HIURA were material to Elevate's decision to continue employing them, paying them, and entrusting them with access to confidential information and client relationships. Had Elevate known that PENA and HIURA were secretly building a competing enterprise, Elevate would have immediately terminated their employment, revoked their access to confidential information, and taken steps to protect its client relationships.

141. PENA and HIURA concealed these material facts with the intent to induce Elevate to continue paying them salaries and benefits, to continue providing them with access to confidential information and client relationships, and to allow them the time and opportunity to complete the formation of HEALTHBRIDGE and orchestrate the diversion of Elevate's clients before their scheme was discovered.

142. Elevate justifiably relied on the absence of any disclosure of competing activities by PENA and HIURA. In the absence of any such disclosure, Elevate reasonably believed that PENA and HIURA were loyal employees working for Elevate's benefit and continued to pay them, provide them access to confidential information, and entrust them with client relationships accordingly.

143. As a direct and proximate result of PENA's and HIURA's fraudulent concealment, Elevate has suffered damages including, but not limited to: (a) all salaries, benefits, and compensation paid to PENA and HIURA during the period of concealment; (b) the value of the business opportunities diverted to HEALTHBRIDGE; (c) the value of the trade secrets and confidential information misappropriated during this period; (d) the costs of investigating and remediating the fraud; and (e) other consequential damages in an amount to be proven at trial.

144. PENA's and HIURA's fraudulent concealment was willful, wanton, and malicious, entitling Elevate to an award of punitive damages.

WHEREFORE, Plaintiff, TLI ABM INC. d/b/a ELEVATE HEALTH TECHNOLOGIES, respectfully demands judgment against Defendants RAUL PENA and DOUG HIURA, jointly and severally, for compensatory damages in an amount to be determined at trial, punitive damages, disgorgement of all compensation paid during the period of concealment, attorneys' fees and costs, pre-judgment and post-judgment interest, and any other and further relief this Court deems just and proper.

**COUNT X**
**CONVERSION**
**(Against Defendants PENA and HIURA)**

145. Elevate adopts and realleges paragraphs 1 through 78 as if restated fully herein.

146. This is an action for conversion against Defendants PENA and HIURA.

147. Elevate paid salaries, benefits, and other compensation to PENA and HIURA in exchange for their loyal service and dedicated work on behalf of Elevate. This compensation was Elevate's property, paid for the specific purpose of securing the services of loyal employees working for Elevate's benefit.

148. PENA and HIURA wrongfully converted Elevate's compensation to their own use by accepting salaries and benefits from Elevate while secretly devoting their time, effort, and attention to building the ENTERPRISE — a direct competitor to Elevate. Rather than providing the loyal service for which they were being compensated, PENA and HIURA used company time and resources to plan and execute the competing enterprise, divert Elevate's clients, recruit Elevate's employees, and misappropriate Elevate's trade secrets.

149. PENA's and HIURA's conversion of Elevate's compensation was willful, intentional, and in conscious disregard of Elevate's rights. The evidence establishes that PENA and HIURA knowingly accepted Elevate's compensation while working for a competing enterprise, and that they deliberately concealed their competing activities to prolong their access to Elevate's payroll.

150. PENA's and HIURA's conversion deprived Elevate of the value of the compensation it paid, as Elevate received no benefit from payments made to employees who were secretly working against Elevate's interests.

151. As a direct and proximate result of PENA's and HIURA's conversion, Elevate has suffered damages in an amount equal to all salaries, benefits, and compensation paid to PENA and HIURA during the period they

were secretly working for HEALTHBRIDGE, plus consequential damages in an amount to be proven at trial.

152. PENA's and HIURA's conversion was willful, wanton, and malicious, entitling Elevate to an award of punitive damages.

WHEREFORE, Plaintiff, TLI ABM INC. d/b/a ELEVATE HEALTH TECHNOLOGIES, respectfully demands judgment against Defendants RAUL PENA and DOUG HIURA, jointly and severally, for compensatory damages in an amount to be determined at trial, punitive damages, restitution of all converted compensation, attorneys' fees and costs, pre-judgment and post-judgment interest, and any other and further relief this Court deems just and proper.

**COUNT XI**
**BREACH OF CONTRACTUAL CONFIDENTIALITY OBLIGATIONS**
**(Against Defendants HIURA and PENA)**

153. Elevate adopts and realleges paragraphs 1 through 78 as if restated fully herein.

154. This is an action by Elevate against Defendants HIURA and PENA for breach of contractual confidentiality obligations.

155. In connection with their employment by Elevate, PENA and HIURA were each subject to confidentiality obligations arising from their employment, including any nondisclosure agreement, employment agreement,

or other restrictive covenant they executed, the obligations of which survive their termination.

156. PENA has breached his contractual confidentiality obligations by, among other things, disclosing and using Elevate's trade secrets and confidential information in connection with the HEALTHBRIDGE scheme, failing to return Elevate's company property, and soliciting Elevate's clients and employees in violation of his non-solicitation obligations.

157. HIURA has breached his contractual confidentiality obligations by, among other things, disclosing and using Elevate's trade secrets and confidential information in connection with the HEALTHBRIDGE scheme, sharing Elevate's operational knowledge, client relationships, and business development methodology with his co-conspirators, and using Elevate's proprietary information to structure and operate the competing enterprise.

158. As a direct and proximate result of PENA's and HIURA's breaches of their contractual obligations, Elevate has suffered and continues to suffer actual damages in an amount to be proven at trial.

WHEREFORE, Plaintiff, TLI ABM INC. d/b/a ELEVATE HEALTH TECHNOLOGIES, respectfully demands judgment against Defendants RAUL PENA and DOUG HIURA, jointly and severally, for compensatory damages in an amount to be determined at trial, attorneys' fees and costs, pre-judgment

and post-judgment interest, and any other and further relief this Court deems just and proper.

**COUNT XII**
**MISAPPROPRIATION OF TRADE SECRETS UNDER THE DEFEND TRADE SECRETS ACT (18 U.S.C. § 1836)**
**(Against All Defendants)**

159. Elevate adopts and realleges paragraphs 1 through 78 as if restated fully herein.

160. This is an action for misappropriation of trade secrets under the Defend Trade Secrets Act, 18 U.S.C. § 1836, et seq.

161. Elevate's proprietary information, as described above, constitutes "trade secrets" within the meaning of 18 U.S.C. § 1839(3) because it consists of financial, business, scientific, technical, and economic information, including patterns, plans, compilations, program devices, formulas, designs, prototypes, methods, techniques, processes, procedures, programs, and codes, that: (a) the owner thereof has taken reasonable measures to keep such information secret; and (b) the information derives independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable through proper means by, another person who can obtain economic value from the disclosure or use of the information.

162. Elevate's trade secrets are related to products and services used in, and intended for use in, interstate and foreign commerce, satisfying the jurisdictional requirements of the DTSA.

163. Defendants have misappropriated Elevate's trade secrets within the meaning of 18 U.S.C. § 1839(5) by: (a) acquiring Elevate's trade secrets through improper means, including theft, misrepresentation, and breach of a duty to maintain the secrecy of, and limit the use of, such trade secrets; (b) disclosing Elevate's trade secrets without consent and through improper means, including PENA's disclosure of confidential IRIS operational data, patient census information, and client lead information to HEALTHBRIDGE co-founders; use of Elevate's proprietary pro forma methodologies and financial modeling tools to create financial projections for HEALTHBRIDGE; Jane Doe's extraction and transmission of HubSpot CRM data and SharePoint documents to PENA; Jane Doe's transmission of Elevate's sales pipeline, operational workflows, formulary data, and contractual templates to HEALTHBRIDGE through the Support@HEALTHBRIDGE.Health email hub and at the direction of or for the benefit of PENA and the competing enterprise; and repurposing of Elevate's Statement of Work template by deleting "Elevate HT" references for use by HEALTHBRIDGE; and (c) using Elevate's trade secrets without consent to establish and operate a competing enterprise.

164. Defendants' misappropriation was willful and malicious, as evidenced by: (a) PENA's deliberate concealment of the scheme through the use of personal email accounts and electronic messaging to coordinate the conspiracy, and his instruction to co-conspirators to minimize the paper trail; (b) PENA's prior identical conduct at Empire, demonstrating a pattern of deliberate trade secret theft; (c) PENA's systematic extraction of data from Elevate's proprietary systems to divert it to the competing enterprise, using Elevate employees to do so; and (d) Nguyen's false impersonation of an Elevate contractor to gain unauthorized access to patient data.

165. As a direct and proximate result of Defendants' misappropriation of Elevate's trade secrets, Elevate has suffered and continues to suffer actual damages in an amount to be proven at trial, including lost profits, loss of client relationships, loss of business opportunities, loss of competitive advantage, and diminution in the value of its trade secrets.

166. Defendants have been unjustly enriched by the misappropriation, and Elevate is entitled to recover any unjust enrichment caused by the misappropriation that is not addressed in computing damages for actual loss, in accordance with 18 U.S.C. § 1836(b)(3)(B)(ii).

167. Because Defendants' misappropriation was willful and malicious, Elevate is entitled to exemplary damages in an amount not more than two times the amount of damages awarded pursuant to 18 U.S.C. § 1836(b)(3)(C).

168. Because Defendants' misappropriation was willful and malicious, Elevate is entitled to an award of reasonable attorneys' fees pursuant to 18 U.S.C. § 1836(b)(3)(D).

169. Elevate is entitled to injunctive relief pursuant to 18 U.S.C. § 1836(b)(3)(A) to prevent any actual or threatened misappropriation of its trade secrets, including an order: (a) enjoining Defendants from using, disclosing, or further disseminating any of Elevate's trade secrets; (b) requiring Defendants to return all Elevate property, documents, data, and electronic files in their possession, custody, or control; (c) requiring Defendants to submit all electronic devices to a neutral third-party forensic examiner for inspection and remediation; and (d) such other injunctive relief as this Court deems just and appropriate.

WHEREFORE, Plaintiff, TLI ABM INC. d/b/a ELEVATE HEALTH TECHNOLOGIES, respectfully demands judgment against Defendants RAUL PENA, DOUG HIURA, HEALTHWAVE SPECIALTY PHARMACY SERVICES, and HEALTHBRIDGE FL LLC, jointly and severally, for compensatory damages in an amount to be determined at trial, exemplary damages, disgorgement of profits, temporary, preliminary, and permanent injunctive relief, attorneys' fees and costs, pre-judgment and post-judgment interest, and any other and further relief this Court deems just and proper.

## COUNT XIII
## MISAPPROPRIATION OF TRADE SECRETS UNDER THE FLORIDA UNIFORM TRADE SECRETS ACT (Fla. Stat. § 688.001, et seq.)
## (Against All Defendants)

170. Elevate adopts and realleges paragraphs 1 through 78 as if restated fully herein.

171. This is an action for misappropriation of trade secrets under the Florida Uniform Trade Secrets Act, Fla. Stat. § 688.001, et seq. ("FUTSA").

172. Elevate's proprietary information, as described above, constitutes "trade secrets" within the meaning of Fla. Stat. § 688.002(4) because it consists of business information, including formulae, patterns, compilations, programs, devices, methods, techniques, or processes, that: (a) derives independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable by proper means by, other persons who can obtain economic value from its disclosure or use; and (b) is the subject of efforts that are reasonable under the circumstances to maintain its secrecy.

173. Defendants have misappropriated Elevate's trade secrets within the meaning of Fla. Stat. § 688.002(2), through improper acquisition, unauthorized disclosure, and unauthorized use of Elevate's trade secrets, as set forth in detail above.

174. Defendants' misappropriation was willful and malicious for the reasons stated in this Complaint.

175. As a direct and proximate result of Defendants' misappropriation, Elevate has suffered and continues to suffer actual damages in an amount to be proven at trial, and Defendants have been unjustly enriched thereby.

176. Because Defendants' misappropriation was willful and malicious, Elevate is entitled to exemplary damages in an amount not exceeding twice any award of damages pursuant to Fla. Stat. § 688.004(2).

177. Because Defendants' misappropriation was willful and malicious, Elevate is entitled to an award of reasonable attorneys' fees pursuant to Fla. Stat. § 688.005.

178. Elevate is entitled to injunctive relief pursuant to Fla. Stat. § 688.003 to prevent any actual or threatened misappropriation of its trade secrets.

WHEREFORE, Plaintiff, TLI ABM INC. d/b/a ELEVATE HEALTH TECHNOLOGIES, respectfully demands judgment against Defendants RAUL PENA, DOUG HIURA, HEALTHWAVE SPECIALTY PHARMACY SERVICES, and HEALTHBRIDGE FL LLC, jointly and severally, for compensatory damages in an amount to be determined at trial, exemplary damages, disgorgement of profits, temporary, preliminary, and permanent injunctive relief, attorneys' fees and costs, pre-judgment and post-judgment interest, and any other and further relief this Court deems just and proper.

## COUNT XIV
## VIOLATION OF THE RACKETEER INFLUENCED AND CORRUPT ORGANIZATIONS ACT (18 U.S.C. § 1962)
## (Against All Defendants)

179. Elevate adopts and realleges paragraphs 1 through 78, including the Predicate Acts allegations in paragraphs 72 through 74 and the pattern allegations in paragraph 75, as if restated fully herein.

***The ENTERPRISE and Pattern of Racketeering Activity.***

180. PENA, HIURA, HEALTHWAVE, and HEALTHBRIDGE are each RICO "persons" within the meaning of 18 U.S.C. § 1961(3), capable of holding legal or beneficial interests in property. PENA held a 25% interest the ENTERPRISE and the Chief Revenue Officer role in HealthBridge Solutions, LLC, and directed revenue generation, target accounts, and client diversions using Elevate access. HIURA held a 25% interest and the Chief Operating Officer role, possessed tie-breaking authority, directed formation and operational design, and used Elevate knowledge to build the competing platform. HEALTHWAVE is a separate California entity owned and operated by Nguyen that supplied or coordinated pharmacy operations and serviced diverted accounts. HEALTHBRIDGE is a separate Florida entity managed by Nguyen that served as an MSO vehicle and participated through its management and onboarding functions. Each named RICO person is distinct from the Enterprise.

181. Nguyen is pleaded as a nonparty participant, not as a defendant. He owned and operated HEALTHWAVE, managed HEALTHBRIDGE FL LLC, held a stated equity and officer role in HealthBridge Solutions, LLC, purchased the HEALTHBRIDGE domain, shared confidential pharmacy and reimbursement data, participated in the Support@HEALTHBRIDGE.Health channel, and coordinated pharmacy and MSO operations. Elevate personnel, including the insiders referred to herein as Jane Doe and John Doe, are pleaded as participants or instruments of the ENTERPRISE to the extent they acted at the direction of PENA, HIURA, Nguyen, HEALTHWAVE, or HEALTHBRIDGE FL LLC.

182. The ENTERPRISE is an association-in-fact enterprise within the meaning of 18 U.S.C. § 1961(4), not HealthBridge Solutions, LLC, HEALTHBRIDGE FL LLC, or HEALTHWAVE standing alone. It consists of an ongoing association among PENA, HIURA, Nguyen as a nonparty participant, HEALTHWAVE, HEALTHBRIDGE FL LLC, HealthBridge Solutions, LLC, and other participating insiders and business vehicles. Its common purpose was to acquire and use Elevate's confidential information and trade secrets to identify, solicit, onboard, and service multiple Elevate clients and prospects through a competing specialty-pharmacy/MSO platform. The ENTERPRISE had relationships and longevity sufficient to pursue that purpose, assigned roles, shared communication channels, coordinated client

onboarding, an operating structure, repurposed Elevate templates and workflows, and a repeatable revenue model. It was broader than, and distinct from, each named RICO person and existed as a continuing unit separate from the predicate acts themselves.

183. PENA conducted and participated in the conduct of the ENTERPRISE's affairs by directing revenue generation, target accounts, employee assistance, and client diversions. HIURA conducted and participated in its affairs by directing formation, operational design, enterprise infrastructure, and client-acquisition planning. HEALTHWAVE, acting through Nguyen and its responsible agents, conducted and participated in the ENTERPRISE's affairs by supplying or coordinating pharmacy operations and facilitating account transitions. HEALTHBRIDGE FL LLC, acting through Nguyen and its responsible agents, conducted and participated in the ENTERPRISE's affairs by supplying the Florida MSO vehicle and coordinating management and onboarding functions. HealthBridge Solutions, LLC supplied the planned multi-member platform, while former Elevate personnel supplied access to Elevate systems and materials at the direction of the foregoing participants. Each named RICO person therefore had a distinct operational or management role in the ENTERPRISE beyond merely conducting an ordinary business.

184. The ENTERPRISE was engaged in, and its activities affected, interstate commerce. Its participants and vehicles operated in California, Florida, Texas, Puerto Rico, and other states; Elevate's clients and prospects were located in multiple states; confidential files and communications moved between Florida and California through personal email, Support@HEALTHBRIDGE.Health, text messaging, WhatsApp, and other interstate electronic facilities; and the ENTERPRISE sought to provide MID, specialty-pharmacy, credentialing, and MSO services across state lines.

185. The open-ended continuity theory in paragraph 75 is incorporated here. The ENTERPRISE's repeatable method—insiders supplying access, concealment preserving that access, and the ENTERPRISE using Elevate information and materials to acquire and service successive accounts—supports a threat of continued racketeering activity beyond any single client transition.

186. This is not merely an ordinary commercial dispute. The allegations involve repeated theft, receipt, and use of Trade Secrets; identified interstate communications used for concealment and deprivation; a structured enterprise with assigned ownership and operating roles; disloyal employees who used entrusted access while holding themselves out as Elevate actors; false authorization used to obtain access to Upland clinic staff and patient data; and repeated targeting of Elevate clients and prospects. The allegations concerning

Upland Rheumatology, IRIS, AOMED, Dr. Del Rosario, the Center for Arthritis and Rheumatic Disease, Articularis, affected patients, and other prospects and leads show the ENTERPRISE's breadth, relatedness, continuity, and repeated-victim character, not a basis for recovering third-party injuries. The RICO claim rests on coordinated Predicate Acts that converted Elevate property and access into a competing business model.

***<u>Substantive RICO Claim Under 18 U.S.C. § 1962(c).</u>***

187. Elevate asserts a civil RICO claim under 18 U.S.C. § 1962(c) and a related conspiracy claim under § 1962(d). The § 1962(c) claim is based only on the Predicate Acts identified in paragraphs 72 through 74 and the pattern allegations in paragraph 75, as incorporated and further described below.

188. PENA conducted and managed specified affairs of the ENTERPRISE by directing revenue generation, target accounts, employee assistance, and client diversions. HIURA conducted and managed specified affairs by directing formation, operational design, infrastructure, and client-acquisition planning. HEALTHWAVE, through Nguyen and its responsible agents, participated in directing and managing the ENTERPRISE's pharmacy operations and account transitions. HEALTHBRIDGE FL LLC, through Nguyen and its responsible agents, participated in directing and managing the ENTERPRISE's Florida MSO, management, and onboarding functions. Through those distinct roles, each named RICO person conducted or

participated, directly or indirectly, in the conduct of the ENTERPRISE's affairs through the pattern of racketeering activity, in violation of 18 U.S.C. § 1962(c). The pattern includes multiple qualifying acts under 18 U.S.C. § 1832 involving specifically identified Elevate Trade Secrets: the IRIS Formulary and related drug, opportunity, reimbursement, and margin data; Upland's active-patient census; HubSpot's Whale Prospects pipeline; SharePoint onboarding and credentialing materials; IRIS workflows, SOPs, order sets, provider and DEA licenses, and access information; Elevate's SOW and MSA templates and client terms; and pro forma tools, financial models, benchmarks, assumptions, and fee-structuring approaches. For each category, the § 1832 acts alleged above involved unauthorized acquisition, copying, transmission, receipt, possession, or use through theft, deception, or breach of duty, with intent to convert the information to the economic benefit of the ENTERPRISE or another non-Elevate actor and intending or knowing that Elevate would be injured. The § 1832 acts were tied to Elevate's interstate specialty-pharmacy, MID, infusion, consulting, and MSO services and were related to the identified § 1343 concealment communications, in violation of 18 U.S.C. § 1962(c).

189. Each Predicate Act was related to the common scheme and purpose. Plaintiff pleads open-ended continuity as the primary theory in paragraph 75. PENA's prior Empire lawsuit is pleaded as evidence of knowledge, intent, absence of mistake, and the threat that the same method

would be repeated. In the alternative, the related conduct extended from at least April 2025, when HIURA formed MIDRx while still employed by Elevate, through March 2026, when the Del Rosario MSA was transmitted for HEALTHBRIDGE's use, supporting closed-ended continuity.

***RICO Conspiracy Claim Under 18 U.S.C. § 1962(d).***

190. PENA and HIURA, together with HEALTHWAVE and HEALTHBRIDGE acting through their responsible agents, knowingly agreed to facilitate the conduct of the ENTERPRISE's affairs through the pattern described above, and each knowingly joined that agreement. The agreement is shown by the participants' assigned roles, shared Support@HEALTHBRIDGE.Health channel, coordinated acquisition and transmission of Elevate materials, direction of Elevate personnel, IRIS offboarding, use of HubSpot leads, repurposing of Elevate templates and workflows, and continued operation of the HEALTHBRIDGE business model. The § 1962(d) claim is based on an agreement to violate § 1962(c), not on a conspiracy to commit an uncharged or non-RICO offense. Nonparty participants' conduct is pleaded as evidence of the agreement and enterprise operation; liability under this Count is sought only against the captioned defendants.

191. By reason of the § 1962(c) violations and the § 1962(d) conspiracy, Elevate was injured in its business and property. Each injury is directly related

to the identified Predicate Acts: (a) lost IRIS revenue resulting from the use of IRIS census, Formulary, workflow, license, DEA, and credentialing information to transfer the account to HEALTHWAVE and HEALTHBRIDGE FL LLC; (b) the direct loss of the Center for Arthritis and Rheumatic Disease opportunity resulting from the HubSpot lead extraction and use; (c) the lost Articularis opportunity and other pipeline opportunities directly pursued through the same stolen-lead information; (d) loss of control over and impairment of the value of Elevate's HubSpot leads, IRIS workflows, credentialing materials, Formulary, patient census, contractual templates, pro forma methodology, and related Trade Secrets, each of which derived value from secrecy and was impaired by unauthorized copying, disclosure, and use; and (e) reasonable investigation, containment, and remediation costs directly caused by the unauthorized transmissions and access. Elevate does not seek remote, derivative, third-party, or patient-privacy injuries that cannot be tied directly to a pleaded Predicate Act. Allegations concerning Upland Rheumatology, IRIS, AOMED, Dr. Del Rosario, the Center for Arthritis and Rheumatic Disease, Articularis, affected patients, and other prospects and leads show the ENTERPRISE's breadth, relatedness, continuity, and repeated-victim character, but are not claims for third-party injuries. Elevate seeks civil RICO recovery under § 1964(c) only for its own direct business and property injuries caused by the identified Predicate Acts.

192. Each injury alleged above was directly caused by the identified Predicate Acts. The § 1832 theft of Elevate's Formulary, patient census, HubSpot pipeline, workflows, credentials, contractual templates, and pro forma materials, together with the identified § 1343 concealment communications, directly enabled the client diversions, competitive losses, and loss of control and value of Elevate's Trade Secrets and confidential business information. Elevate therefore seeks the civil remedy provided by 18 U.S.C. § 1964(c), including threefold damages for the injury to its business or property, the costs of suit, and reasonable attorneys' fees. No RICO injunctive relief is sought in this Count.

WHEREFORE, Plaintiff, TLI ABM INC. d/b/a ELEVATE HEALTH TECHNOLOGIES, respectfully demands judgment against Defendants RAUL PENA, DOUG HIURA, HEALTHWAVE SPECIALTY PHARMACY SERVICES, and HEALTHBRIDGE FL LLC for treble damages pursuant to 18 U.S.C. § 1964(c), the costs of suit, and reasonable attorneys' fees.

## DEMAND FOR JURY TRIAL

Plaintiff hereby demands a trial by jury on all issues and claims so triable.

Dated: October 9, 2026

Respectfully submitted,

**FOLEY & LARDNER LLP**

*/s/ Mary Caroline Cravatta*
MARY CAROLINE CRAVATTA
Florida Bar No. 125712
301 E. Pine Street, Suite 1200
Orlando, Florida 32801
Telephone: (407) 423-7656
mcravatta@foley.com

VANESSA SINGH JOHANNES
Florida Bar No. 1028744
200 S Biscayne Blvd, Suite 2100
Miami, Florida 33131
Telephone: (305) 482-8400
Facsimile: (305) 482-8600
vanessa.johannes@foley.com

TRAVIS K. JANG-BUSBY
(*pro hac vice forthcoming*)
11988 El Camino Real, Suite 400
San Diego, CA 92130
Telephone: (858) 847-6700
travis.jang-busby@foley.com

CAROLINE DUNKLE ROYCE
Florida Bar No. 1025139
One Independent Drive, Suite 1300
Jacksonville, Florida 32202-5017
Telephone: (904) 359-8734
croyce@foley.com

*Counsel for Plaintiff*